UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FRANCES SLANE,

                Plaintiff,

v.                              Case No:  2:15-cv-181-FtM-38CM

CITY OF SANIBEL and JUDITH ANN
ZIMOMRA,

                Defendants.

_____/

## ORDER[1]

    This matter comes before the Court on Defendants' Motion to Dismiss Amended Complaint (Doc. #28) filed on June 2, 2015.  Defendant Judith Anna Zimomra asks the Court to dismiss both Counts 1 and 2, as asserted against her, while Defendant City of Sanibel asks the Court to dismiss only Count 2, as asserted against it.  (Doc. #28). Plaintiff filed a Response in Opposition on June 19, 2015.  (Doc. #30).  The matter is ripe for review.

### Background

    Plaintiff Frances Slane ("Slane") is a former employee of Defendant City of Sanibel's ("the City") Finance Department.  (Doc. #24 at 3).  The City is a Florida municipal corporation, who employs Defendant Judith Ann Zimomra ("City Manager Zimomra") as its City Manager.  (Doc. #24 at 3).  In August 2014, Slane overheard the City's Mayor,

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the Court has no agreements with any of these third parties or their Web sites. The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

Kevin Ruane ("Mayor Ruane"), request a city charter amendment that would provide him and other employees of the City with a monthly stipend to help with travel expenses. (Doc. #24 at 3).  The basis for this request was that, while on official travel for the City, Mayor Ruane and the other employees routinely paid travel expenses out of their own pocket.  (Doc. #24 at 3-4).   As an employee of the City's Finance Department, Slane knew that this was not true, and confirmed as much by searching through the City's files. (Doc. #24 at 4).  Once Slane possessed the documents that proved Mayor Ruane's statements were false, she sent them, anonymously, to a local newspaper.  (Doc. #24 at 4).  The newspaper, however, rejected the anonymous submission and returned the documents to City Manager Zimomra.  (Doc. #24 at 4).

After Mayor Ruane discovered that someone stole documents from the City and sent them to the newspaper, he "demanded" that the City "hunt down 'the culprit' who exposed his untruthful statements."  (Doc. #24 at 4).  Eventually, the City confronted Slane about stealing the documents.  (Doc. #24 at 4).  After initially refusing to respond, Slane admitted to stealing the documents, and the City placed her on administrative leave from early December to early February.  (Doc. #24 at 4-5).  When Slane returned to work, City Manager Zimomra "issued [] Slane a three-day unpaid suspension for 'unethical behavior'"; "instructed [] Slane that she would have to be retrained in ethics"; and "instructed [] Slane to write a letter of apology to [] [M]ayor [Ruane]."  (Doc. #24 at 6). Slane refused to write the letter of apology.  (Doc. #24 at 6).  City Manager Zimomra also demanded that Slane destroy any electronic copies of the City's documents that she stole, and then execute an affidavit verifying that she had done so.  (Doc. #24 at 7).  Slane

refused to comply with this task also – this time on the advice of counsel. (Doc. #24 at 7).

During this same time period, Slane announced her intention to run for the City's Council against two other candidates. (Doc. #24 at 5). Upon hearing Slane's intention, the City's Administrative Services Director forwarded Slane an opinion drafted by the City Attorney, noting that a Florida Statute prevented government employees from sitting on the governing body of the governmental entity by which they were employed. (Doc. #24 at 6). Slane disagreed with the opinion and filed a state court action, seeking a declaratory judgment specifying that she could both sit on the governing body of and remain employed by the same governmental entity. (Doc. #24 at 6). In the end, Slane finished third in the City Council race, essentially mooting her declaratory action. (Doc. #24 at 6). Slane believes that it is notable, however, that she ran her campaign "on a platform of 'open government' and 'transparency.'" (Doc. #24 at 5).

Soon after Slane settled in from her administrative leave and political campaign, City Manager Zimomra "turned up the heat" on her. (Doc. #24 at 7). As Slane explains, on a few different occasions, her immediate supervisor reprimanded her, at the direction of City Manager Zimomra. (Doc. #24 at 7). One such incident occurred when Slane "follow[ed] the procedures verbally given to her by her predecessor" and called a local business regarding their lapsed insurance, rather than putting the inquiry in writing. (Doc. #24 at 7-8). Another incident occurred when Slane sent an email to another local business that City Manager Zimomra described as "insulting in tone" and "inappropriate." (Doc. #24 at 8). As a result of this latter incident, Slane's supervisor demanded that she draft a letter of apology addressed to the local business involved and submit it for review.

(Doc. #24 at 9).  Once Slane did so, her supervisor did not provide any feedback about her letter.  (Doc. #24 at 9).  Later, however, City Manager Zimomra drafted a separate letter of apology, which Slane's supervisor forced her to sign – an event Slane describes as "harassment."  (Doc. #24 at 9).

That evening, Slane's supervisor informed Slane that her three-day suspension arising from her unethical behavior involving the stolen documents would begin on the following Monday.  (Doc. #24 at 9).  Slane also received a letter from City Manager Zimomra that demanded she delete any electronic versions of the stolen documents that she still possessed, and then sign an affidavit swearing that she had done so.  (Doc. #24 at 9-10).  Finally, Slane's supervisor demanded that she surrender her identification card and keys for the City's facilities.  (Doc. #24 at 10).

Upon her return, Slane had to spend two days scanning in documents, even though this was typically a task conducted by temporary workers.  (Doc. #24 at 10).  Slane's email and computer access were terminated, except for Adobe Acrobat and scanner access.  (Doc. #24 at 10).  And the City's Administrative Services Director handed Slane a letter that noted the City did not consider her a member of the local collective bargaining unit because she was a supervisor.  (Doc. #24 at 10).  At that point, Slane instituted this action against the City, asserting two counts for civil rights violations under the First Amendment and Equal Protection Clause.  (Doc. #24).  A few weeks later, the City terminated Slane's employment, noting that she "failed to adhere to the professional ethical standards of conduct required in [her] supervisory position"; "repetitively and grossly misused [her] [work] computer, including . . . engag[ing] in activities unrelated to [her] job duties"; and falsely submitted timesheets "certifying that

[she] was engag[ing] in . . . [her] assigned job responsibilities while [she] [was] engaged in frequent and repetitive extensive misuse of the City's [i]nternet services and [] equipment." (Doc. #24 at 11).  Now, the City and City Manager Zimomra jointly file the instant Motion to Dismiss.  (Doc. #28).

## Legal Standard

In deciding a Rule 12(b)(6) motion to dismiss, the Court limits its consideration to well-pleaded factual allegations, documents central to, or referenced in, the complaint, and matters judicially noticed.  *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).  The Court must accept all factual allegations in a plaintiff's complaint as true and take them in the light most favorable to the plaintiff.  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  Conclusory allegations, however, are not entitled to a presumption of truth.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1036 n. 16 (11th Cir. 2001).

The Court employs the *Twombly–Iqbal* plausibility standard when reviewing a complaint subject to a motion to dismiss.  *Randall v. Scott*, 610 F.3d 701, 708, n. 2 (11th Cir. 2010).  A claim is plausible if the plaintiff alleges facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.  The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Marsh*, 268 F.3d at 1036 n. 16.  Thus, "the-defendant-unlawfully harmed me accusation" is insufficient.  *Iqbal*, 556 U.S. 662, 677, 129 S.Ct. 1937, 173 L.Ed.2d 868.  "Nor does a complaint suffice if it tenders naked assertions

devoid of further factual enhancement." *Id.* (internal modifications omitted).  Further, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

## Discussion

The City and City Manager Zimomra move to dismiss portions of this action for two separate reasons.  First, City Manager Zimomra seeks to dismiss the First Amendment violation claim asserted against her in Count 1 on the basis that she is entitled to qualified immunity.  Second, both the City and City Manager Zimomra seek to dismiss Count 2, claiming a violation of Slane's Equal Protection Clause rights, on the basis that it fails to state a claim upon which relief can be granted.  Slane adamantly opposes each of these requests.  The Court will address each argument on a count-by-count basis.

### A. Count 1 – Violation of the First Amendment

Slane brings Count 1 against both the City and City Manager Zimomra, averring that their actions violated her rights under the First Amendment.  Stated in the simplest terms, Slane believes that the City and City Manager Zimomra violated her rights by punishing her for acts committed during her employment that were protected by the Free Speech and Right to Petition Clauses of the First Amendment.  City Manager Zimomra contends that even if these allegations are true (which she denies), qualified immunity protects her; and therefore Count 1, as asserted against her, must be dismissed.  In making this argument, however, City Manager Zimomra argues that at least one act Slane relies on does not qualify as "speech," and is therefore not protected by the First Amendment.  The Court will address each argument in turn.

1.  *Slane's Submission of Documents to the Newspaper is Not Speech Entitled to First Amendment Protection*

The first issue before the Court is whether Slane's act of anonymously providing stolen government documents to the newspaper qualifies as speech protected by the First Amendment.  The Court finds that it does not.  No one disputes that the First Amendment protects more than just the literal definition of "speech."  *See Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989) ("[W]e have long recognized that [the First Amendment's] protection does not end at the spoken or written word.").  Indeed, "conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments."  *Id.* (internal quotation marks and citations omitted).  But not all conduct is entitled to this protection.  The Supreme Court has "rejected the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."  *Id.* (internal quotation marks and citations omitted).  The determination of whether conduct qualifies as speech therefore rests upon whether "an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it."  *Id.* (internal quotation marks, citations, and alterations omitted).

When Slane submitted the stolen documents to the newspaper, there is no doubt that she intended to convey a particularized message.  She wanted to expose Mayor Ruane and other employees of the City for lying about their travel expenses.  Unfortunately for her, however, it appears that there was not a great likelihood that this message would be understood by those who viewed it.  To begin, Slane submitted only the stolen documents.  She did not include a note explaining the relevance of her

submission; nor did she add any marks or highlights to the documents that would assist the newspaper in determining their relevance.  Slane never contacted the newspaper to discuss the relevance of her submission either.  Instead, Slane submitted the documents anonymously.  Had, for instance, Slane submitted the stolen documents under her own name, or even as an anonymous employee of the City's Finance Department, the newspaper might understand that the documents were submitted to expose an irregularity or even illegality related to the City's finances.  But she did not.  In all, Slane's submission was void of any original content; she only forwarded credit card billing statements and other unaltered documents.

Without doing more than simply anonymously submitting stolen government documents, Slane's conduct, in this instance, does not qualify as speech entitled to First Amendment protection.  Interestingly, Slane cannot present the Court with a case indicating otherwise.  She does, however, attempt to rely on *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009).  But *Andrew* is clearly distinguishable.  There, the plaintiff, a Major employed by the Baltimore Police Department, submitted a memorandum *that he wrote* to a local newspaper.  *Id.* at 264-65.  Unsurprisingly, the Fourth Circuit never discussed whether that submission qualified as speech.  *Id.* at 266-71.  It is clear that it did.  Instead, the issue before the court was whether the plaintiff spoke on a matter of public concern.  *Id.*  In contrast, the instant action is not at that stage yet.  Before it can get there, the Court must first determine whether the conduct at issue qualifies as speech.  And based on the analysis above, it is clear that it does not.

   2. *Slane Successfully Asserts a First Amendment Retaliation Claim Based on Her Political Speech*

Slane's submission of stolen government documents, however, is not the only act she allegedly engaged in that she argues was protected by the First Amendment. Slane also believes that the City and City Manager Zimomra retaliated against her for engaging in political speech during her campaign for a seat on the City's Council. This time, there is no question that Slane's conduct qualifies as speech. Rather, the issue is whether this speech was protected by the First Amendment. The Court finds that it was.

Time and again, the Supreme Court has reiterated that "[s]peech by citizens on public concerns lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. ------, 134 S.Ct. 2369, 2377, 189 L.Ed.2d 312 (2014) (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). And "[t]his remains true when speech concerns information related to or learned through public employment." *Id.* For it is well established that the acceptance of public employment does not require the employee to relinquish their constitutional rights, especially those afforded under the First Amendment. *Id.*

But a public employee's right to disseminate information is not absolute. Instead, the Supreme Court has "acknowledged the government's countervailing interest in controlling the operation of its workplaces" because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* Consequently, "[t]he problem in any case is to arrive at a balance between the interests of the [government employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968).

The Supreme Court first announced "some of the general lines along which an analysis of the[se] controlling interests should run" in *Pickering,* 391 U.S. at 569, 88 S.Ct. 1731. From these general lines, two inquiries emerged to guide interpretation of the First Amendment protection provided to a public employee's speech. The first inquiry asks whether the employee spoke on a matter of public concern. *Garcetti*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). If not, then the employee is not entitled to First Amendment protection for his or her employer's reaction to the speech. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). But if the answer to this first inquiry is yes, then the Court is alerted to the possibility of a First Amendment claim. The Court must then proceed to the second inquiry of the *Pickering* framework, and the relevant question becomes whether the defendant government entity had an adequate justification for treating the plaintiff employee differently from any other member of the general public. *Id.* (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

Nearly forty years after the *Pickering* framework first emerged, the Supreme Court modified the first inquiry in *Garcetti*, 547 U.S. 410, 126 S.Ct. 1951. In doing so, the Supreme Court emphasized that courts must consider not only whether the plaintiff was speaking on a matter of public concern, but also whether the plaintiff was speaking as a private citizen or as a public employee. *Id.* at 418, 126 S.Ct. 1951. As the *Garcetti* Court explained, "when public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951.  After this modification, the first inquiry of the *Pickering* framework now asks "whether the employee spoke as a *citizen* on a matter of public concern." *Id.* at 418, 126 S.Ct. 1951 (emphasis added); *see also D'Angelo v. Sch. Bd. of Polk Cnty., Fla.*, 497 F.3d 1203, 1209 (11th Cir. 2007) (collecting cases that note *Garcetti* significantly modified the first inquiry of the *Pickering* framework).

Most recently, the Supreme Court clarified its holding in *Garcetti*, finding that courts were reading the case too broadly. *Lane*, 573 U.S. at ----, 134 S.Ct. at 2379.  In *Lane*, the Supreme Court turned down reasoning "that, because [a plaintiff] learned of the subject matter of his testimony in the course of his employment with [the defendant government entity], *Garcetti* requires that his testimony be treated as the speech of an employee rather than that of a citizen." *Id.* (citation omitted).  In doing so, the Supreme Court noted that "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment." *Id.* The Court then went on to clarify that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.*  Rather, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

With this framework in mind, the Court must first determine whether Slane spoke as a private citizen or as a public employee within the scope of her duties. *Id.* Throughout her Amended Complaint, Slane details her attempt to expose inefficient government

spending.  To be exact, how she mounted a political campaign for an open seat on the City Council, focusing her campaign on transparency in government and the need to curtail inefficient government spending.  If Slane voiced these concerns to only the City or one of its employees, there is no doubt that her speech would qualify as employee speech unprotected by the First Amendment.  But she did not – she mounted a full political campaign focused on these exact issues.  And it does not appear that mounting political campaigns was within her ordinary job duties as an employee of the City's Finance Department.  Consequently, Slane's communications regarding the City's fiscal inefficiencies during her campaign clearly qualify as citizen – rather than employee – speech.

Next, the Court must consider whether Slane's speech as a citizen was on a matter of public concern.  The Supreme Court has routinely held that "[e]xposing governmental inefficiency and misconduct is a matter of *considerable significance*."  *Garcetti*, 547 U.S. at 425, 126 S.Ct. 1951; *see also Lane*, 573 U.S. at ----, 134 S.Ct. at 2380 ("The content of Lane's testimony – corruption in a public program and misuse of state funds – obviously involves a matter of significant public concern.").  Based on this clear Supreme Court precedent, there is little doubt that the content of Slane's speech – the misuse of government funding – was a matter of public concern.

Having determined that Slane spoke as a private citizen on a matter of public concern, the Court must proceed to the second inquiry of the *Pickering* framework: whether the City or City Manager Zimomra had an adequate justification for treating Slane differently from any other member of the general public.  *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951.  Here, City Manager Zimomra fails to raise any governmental interests that

illustrate Slane's political speech should not be afforded First Amendment protection.[2] Nor does City Manager Zimomra argue that the City treats every other member of the general public in the same manner.  Without such an argument, City Manager Zimomra must provide an alternative argument – asserting that the City had an adequate justification for treating Slane differently – in order to defeat Slane's First Amendment political speech claim.  But City Manager Zimomra fails to raise that argument either. Consequently, at this stage in the litigation, the Court concludes that Slane's political speech is entitled to protection under the First Amendment.

   3.  *Slane Successfully Asserts a First Amendment Retaliation Claim Based on Her Right to Petition*

   Slane's First Amendment allegations do not end there, however.  Slane also avers that the City and City Manager Zimomra violated her First Amendment rights under the Petition Clause by retaliating against her after she brought a law suit against the City, seeking a declaratory judgment that Florida Statute § 112.313(10)[3] was unconstitutional. For her part, City Manager Zimomra avers that Slane fails to allege a First Amendment retaliation claim based on the Petition Clause because Slane's lawsuit focused on only herself, and not the public at large.  (Doc. #28 at 10).  The Court disagrees.

---

[2] City Manager Zimomra attempts to raise governmental issues illustrating that Slane's conduct related to the stolen documents should not be afforded First Amendment protection.  (Doc. #28 at 11).  But she fails to do the same for Slane's conduct related to her political speech.

[3] That statute provides, in pertinent part:

   No employee of a state agency or of a county, municipality, special taxing district, or other political subdivision of the state shall hold office as a member of the governing board, council, commission, or authority, by whatever name known, which is his or her employer while, at the same time, continuing as an employee of such employer.

§ 112.313(10)(a).

The Supreme Court has long held that "the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. ----, 131 S.Ct. 2488, 2494, 180 L.Ed.2d 408 (2011). It "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives . . . ." *Id.* at 2495. But a citizen's right to petition is not unlimited. Rather, "[t]he substantial government interests that justify a cautious and restrained approach to the protection of speech by public employees are just as relevant when public employees proceed under the Petition Clause." *Id.* 2496. Because of this, allegations that a government employer violated an employee's right to petition must be evaluated under the same standard as Speech Clause claims: in order to be actionable, the public employee must petition the government as a citizen on a matter of public concern. *Id.* at 2500.

City Manager Zimomra fails to raise any argument that Slane petitioned the City as a public employee rather than a private citizen. The only issue before the Court then is whether Slane petitioned the City on a matter of public concern, rather than a private employment issue. City Manager Zimomra is correct in part: Slane's lawsuit did focus on her ability to remain an employee of the City and serve on its Council. But that was not its sole focus. The lawsuit also sought to declare a state statute unconstitutional so that she, and many other government employees, could sit on the governing body of the government entity that employed them. The fact that she included herself in the action does not moot its overall objective. It is clear that Slane was interested in bringing political change for the general public, and not just herself. And political change for the general public is undoubtedly a matter of public concern. *See Lane*, 573 U.S. at ----, 134 S.Ct. at

2380 (describing how a matter of public concern includes "any matter of political, social, or other concern to the community").   Thus, at this stage in the litigation, the Court concludes that Slane's petition conduct is entitled to protection under the First Amendment.[4]

4. *City Manager Zimomra is Entitled to Qualified Immunity*

Having determined that Slane successfully alleges a First Amendment retaliation claim against the City and City Manager Zimomra, the Court must now determine whether City Manager Zimomra is entitled to qualified immunity.[5]   It is well known that "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"   *Lane*, 573 U.S. at ----, 134 S.Ct. at 2381 (quoting *Ashcroft v. al-Kidd*, 563 U.S. ----, ----, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011)). Because of this, "courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and 'the right was 'clearly established' at the time of the challenged conduct.'"   *Id.*   But in order to be "clearly established," the right must be one that has been "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law."   *Sherrod v.*

---

[4] The Court need not determine whether governmental interests outweigh Slane's right to petition because the City and City Manager Zimomra, once again, failed to argue as much.

[5] Slane asserts her First Amendment claim against City Manager Zimomra in both her official and personal capacities. But because the Eleventh Amendment bars any claims against City Manager Zimomra in her official capacity, the Court's discussion will focus solely on the First Amendment claim as if it were pled against City Manager Zimomra in her personal capacity.   *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (holding that "a suit against a state official in his or her official capacity is not a suit against the official but rather against the official's office," and is therefore barred by the Eleventh Amendment).

*Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) *cert. denied*, 133 S.Ct. 646, 184 L.Ed.2d 465 (2012) (citation omitted).

Moreover, whether the government official was motivated by dislike or hostility towards the protected behavior is not, in and of itself, dispositive. *Id.* Where the government official acts in the same manner that they would have absent the discriminatory intent, their actions are lawful. *Id.* In other words, "'[u]nless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct—despite his having adequate lawful reasons to support the act—was the result of his unlawful motive, the defendant is entitled to immunity.'" *Id.* (quoting *Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996)). Applying these principles, the Court must determine whether City Manager Zimomra knew whether her retaliatory actions, based upon all the information available to her at the time, including any knowledge of Slane's protected behavior, were objectively reasonable.[6] *Id.* at 1364 (citing *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1294 (11th Cir. 2000)).

The facts presented in the Amended Complaint illustrate City Manager Zimomra had lawful justifications for each of the alleged retaliatory acts, entitling her to qualified immunity. *See Jackson v. Humphrey*, 776 F.3d 1232, 1241 (11th Cir. 2015) ("[T]he law of this Circuit is that, where, as here, the facts . . . show both a lawful and unlawful motivation for the decision made by a government official, the official is entitled to qualified immunity."). The first retaliatory act that Slane complains about is being placed on

---

[6] Slane fails to raise the argument that City Manager Zimomra was not acting in her discretionary capacity. The Court's analysis therefore will focus on Slane's burden of illustrating that City Manager Zimomra is not entitled to qualified immunity. *See Sherrod*, 667 F.3d at 1363 (noting that when parties do not dispute that the defendants were acting in a discretionary capacity, the burden shifts to the plaintiff to illustrate qualified immunity is inapplicable).

administrative leave for two months.  This administrative leave, however, was instituted only after Slane admitted to stealing the City's documents and submitting them to the newspaper – City Manager Zimomra's lawful motivation.  Not to mention, City Manager Zimomra placed Slane on administrative leave before she engaged in any behavior protected by the First Amendment, illustrating that City Manager Zimomra likely had no unlawful motive for this act at all.

Next, Slane complains that City Manager Zimomra retaliated against her by 1) placing her on a three-day unpaid suspension for "unethical behavior"; 2) instructing her that she would have to be retrained in ethics; and 3) demanding that she write a letter of apology to Mayor Ruane for her actions.  But City Manager Zimomra had the same lawful motivation for each of these acts too – Slane's theft of the City's documents.  Slane further complains that City Manager Zimomra retaliated against her by having her supervisor reprimand her.  Specifically, Slane focuses on the fact that she had to sign a letter of apology addressed to a local business, and was told that she did not know how to write a business letter.  The letter of apology, however, arose because Slane sent an email to the business that was "insulting in tone."  Likewise, the business letter comment arose after Slane erred in drafting a letter for her supervisor.  Even if City Manager Zimomra had an unlawful motive for orchestrating these acts, a lawful motive was also present.

Slane continues by noting that City Manager Zimomra retaliated against her yet again by limiting her computer access to only a scanner and Adobe Acrobat and forcing her to scan business documents for two days.  But the facts alleged in Slane's Amended Complaint show that these acts trace back to Slane's theft of government documents and consequent failure to adhere to the professional ethical standards of conduct required by

her supervisory position.  And for the final act, Slane avers that City Manager Zimomra retaliated against her by firing her.  Slane's Amended Complaint, however, illustrates a lawful motive that accompanies any unlawful motive: Slane "repetitively and grossly misused" her work computer for conduct unrelated to her job duties and submitted false timesheets during this same time period.

Slane fails to present any precedent, and the Court is aware of none, suggesting that a reasonable City Manager armed with the knowledge City Manager Zimomra possessed, to include all of the lawful justifications detailed above, would know they could not take the acts that City Manager Zimomra allegedly took in retaliation for Slane's protected behavior.  Slane does present the Court with two cases[7] that she believes established her rights in such a way that made it obvious to City Manager Zimomra that she was violating federal law.  But both of those cases are easily distinguishable.

In *Stough v. Gallagher*, 967 F.2d 1523 (11th Cir. 1992), a newly elected sheriff demoted a high-ranking officer for openly supporting another candidate during the elections.  There was no lawful justification for this demotion; the new sheriff simply wanted to retaliate against all those who failed to support his campaign.  This is a stark difference from the instant action.  Here, City Manager Zimomra had a lawful motivation for every action she took.  Slane's second citation, *Borough of Duryea v. Guarnieri*, 564 U.S. ----, 131 S.Ct. 2488, fairs no better.  There, the Supreme Court simply held that a

---

[7] Slane provides the Court with a third citation, attempting to establish that her First Amendment rights with regard to the document submission to the newspaper were protected.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (holding that anonymously handing out leaflets with original content on them is activity protected by the First Amendment).  But this citation is now moot after the Court determined that Slane's activity related to the stolen documents is not entitled to First Amendment protection.

public employee's claim under the Petition Clause must meet the same requirements as a claim set out under the Speech Clause.  The Supreme Court never decided whether the plaintiff had a viable claim under the Petition Clause; the Court simply remanded the case to the Third Circuit for consideration under that standard.  Clearly, neither of these cases made it obvious to City Manager Zimomra that she was violating federal law.

Based on the foregoing, City Manager Zimomra is entitled to qualified immunity, and Slane's First Amendment claim, as asserted against City Manager Zimomra, must be dismissed.

## B. Count 2 – Violation of the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment mandates that government employers treat similarly situated employees alike. Slane alleges that the City violated this mandate by not providing her with the same "grievance rights" that her supervisors and unionized coworkers receive.[8]  The City argues that Slane fails to state an equal protection claim on these facts because neither Slane's unionized coworkers nor her supervisors are similarly situated to her.  The Court agrees.

The Eleventh Circuit addressed part of the City's argument in *Donnell v. Lee Cnty. Port Auth.*, 509 Fed.Appx. 903 (11th Cir. 2013).  There, the court held that a non-unionized employee could never bring an equal protection claim against a government employer based on grievance rights awarded to a unionized employee.  *Id.* at 905.  This is because unionized employees enjoy a unique status in the workplace, meaning they

---

[8] Slane appears to assert this allegation on behalf of all supervisory personnel, rather than on a "class-of-one" theory.  This is important because the Supreme Court has affirmed that "a class-of-one theory is inapplicable to decisions made by public employers with regard to their employees."  *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 596, 128 S.Ct. 2146, 2150, 170 L.Ed.2d 975 (2008).

are "never similarly situated with non-unionized employees." *Id.* (citing *Marshall v. W. Grain Co.*, 838 F.2d 1165, 1170 (11th Cir. 1988)) (internal quotation marks and alterations omitted).   Because of this unique status, Slane cannot rely upon the difference in grievance rights among the City's non-unionized and unionized employees to support her equal protection claim.

The remainder of Slane's equal protection claim fairs no better.   As the Supreme Court has explained, "[t]he Equal Protection Clause does not forbid classifications." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992).   "It simply keeps governmental decisionmakers from treating differently persons who are *in all relevant respects alike.*" *Id.* (citations omitted; emphasis added).   By this standard, Slane's equal protection claim fails because Slane and her supervisors are not "in all relevant respects alike."   In the Amended Complaint, Slane dedicates three pages to explaining why she is a "public employee" as defined by the relevant Florida Statute. (Doc. #24 at 13-16).   Then, in her next breath, Slane admits that all of her supervisors – i.e., City Manager Zimomra's "direct reports" – are "clearly exempt from being 'public employees'" by the same Florida Statute.   (Doc. #24 at 18).   Notably, this is only one of many facts that differentiate Slane's employment from that of her supervisors.   By failing to allege that her supervisors' employment is in all relevant respects alike to hers, Slane fails to state an equal protection claim.

Accordingly, it is now

**ORDERED:**

Defendants' Motion to Dismiss Amended Complaint (Doc. #28) is **GRANTED**.

1. Plaintiff Frances Slane's Count 1, as asserted against Defendant Judith Ann Zimomra, is **DISMISSED with prejudice**.  This Order does not affect Count 1 as asserted against Defendant City of Sanibel.

2. Plaintiff Frances Slane's Count 2, as asserted against Judith Ann Zimomra and City of Sanibel, is **DISMISSED without prejudice**.

**DONE** and **ORDERED** in Fort Myers, Florida, this 17th day of July, 2015.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record